# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 16, 2004 Session

## STATE OF TENNESSEE v. JOEY DEWAYNE THOMPSON

**Appeal from the Criminal Court for Knox County**
**No. 73384     Ray L. Jenkins, Judge**

———————————

**No. E2003-00569-CCA-R3-CD - July 16, 2004**

———————————

The defendant, Joey Dewayne Thompson, appeals as of right from his convictions by a jury in the Knox County Criminal Court for second degree murder, a Class A felony, and attempted second degree murder, a Class B felony. The trial court sentenced him to twenty-five years for the second degree murder and twelve years for the attempted second degree murder, to be served consecutively in the Department of Correction. The defendant contends that: (1) the evidence is insufficient to support the convictions; (2) the trial court erred by allowing the state to amend the indictment to include a count for first degree felony murder; (3) the trial court erred by admitting a 9-1-1 tape; (4) the trial court erred by allowing reference to the defendant's nickname, "Joe Thug"; (5) the trial court erred by allowing the state to cross-examine the defendant on a robbery charge that had been dismissed; (6) prosecutorial misconduct requires a new trial; (7) the trial court erred in its instructions to the jury regarding "knowing"; and (8) the trial court erred in giving him excessive and consecutive sentences. We conclude that the trial court committed reversible error in its instructions to the jury regarding "knowing." Accordingly, we reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed and Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Joey Dewayne Thompson.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Phillip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's shooting into a car on June 23, 2001, killing Latoya Robinson and injuring Travis Burgins. Shirley King testified that on June 23, 2001, she was outside with her grandchildren and heard about three consecutive gunshots before she entered her house. She said she did not know how many shots were fired after she went inside. She said that when the shots ended, she looked out her window and saw a car rolling toward her house. She said a man inside the car put the car into gear and then fell outside the car. She said that she called 9-1-1 and that she went to the man that fell outside the car and asked him who shot him, to which the man responded, "Thug." She said she checked on the woman in the car and saw that she had been shot and was gasping for air. She said that she stayed with the woman until an ambulance arrived but that the woman was not able to speak. She said she had known the defendant his entire life but did not know to whom Mr. Burgins was referring when he said that "Thug" had shot him.

Travis Burgins testified that on June 23, 2001, he had been dating Latoya Robinson for about one year and that before him, she had dated the defendant's brother, Amos Wright. He said he knew the defendant and referred to him as "Joe Thug." He said that before June 23, 2001, he had never had any problems with the defendant but that he did have a verbal altercation with Mr. Wright. He said that on June 23, he and Ms. Robinson were driving to his grandmother's house when he saw Mr. Wright, who yelled that Ms. Robinson was a "yellow bitch." He said that he had Ms. Robinson park the car at his grandmother's house and that he went to confront Mr. Wright. He said that when he reached Mr. Wright, Mr. Wright was in his car and drove away after Mr. Burgins asked him to fight.

Mr. Burgins testified that after the incident with Mr. Wright, he rode with Ms. Robinson to a convenience store and left to go to her brother's house. He said that at an intersection on the way to Ms. Robinson's brother's house, he saw the defendant on a cellular telephone and waived at him. He said that after waiving at the defendant, they continued toward Ms. Robinson's brother's house but that a car was parked in the middle of the street blocking their way. He said he turned around and noticed the defendant jogging toward them but did not think anything about it. He said he heard the sound of a bullet in the chamber of a gun and told Ms. Robinson to "pull off." He stated that he saw the defendant with a gray gun that had a long clip and that the defendant stuck the tip of the gun inside the passenger side window and began shooting. He said the defendant was firing one shot right after another but was not looking inside the car while he was shooting. He stated that he did not say or do anything to provoke the defendant.

Mr. Burgins testified that he saw Ms. Robinson wounded once in the arm and twice in the leg and that he positioned his body to try to block bullets from hitting her. He said the defendant shot him five times, four times in his right leg and one time in his left. After the shooting, he saw the defendant run away and saw Ms. Robinson's eyes roll back in her head. He said that he realized the car was rolling, that he put the car into park, and that he fell out of the car. While he was waiting for an ambulance to arrive, a friend came and offered him a gun in case the defendant returned. He said that he declined the offer and that his friend threw the gun into his car when the police arrived. He said he told the police his name was Tyrane Burgins because he did not want the defendant or

the defendant's family to find and kill him. He acknowledged that he had given the police false names in the past.

On cross-examination, Mr. Burgins testified that he played basketball with the defendant two weeks before the shooting and that everything was okay. He said that when Amos Wright called Ms. Robinson a "yellow bitch" from his car, a woman and a child were also in Mr. Wright's car. He denied that he was upset with Mr. Wright because he had caught him with Ms. Robinson. He said that when he confronted Mr. Wright, he wanted to fight him with his fists, not a gun. He said that his brother's name was Tyrane Goodwyn and that he did not tell anyone his correct name until a detective came to see him at the hospital after the shooting. He said he did not know who was in the car that was blocking the street before the shooting. He denied telling police thirty days after the shooting that the defendant's first shot entered Ms. Robinson's head but acknowledged telling them that someone must have planted the gun in his car. He said that when he was shot, bullets entered through the front of his legs and left through the back. He denied that police found crack cocaine and marijuana in his car after the shooting. He said the shooting occurred about seven to eight minutes after he confronted Mr. Wright for calling Ms. Robinson a "yellow bitch." He said his car did not start rolling until after the shooting.

Julian Dixson testified that although he did not know the defendant's name until after the June 23, 2001 shooting, he had known the defendant for many years. He said that on June 23, he saw a black car blocking the car behind it and saw the defendant jogging toward the second car after the black car drove away. He said he noticed the defendant was carrying a gun before he reached the car. He said that he saw the defendant raise the gun and point inside the car from about three feet away, on the passenger side of the car but that he did not see any movement from the people inside the car. He said the defendant shot inside the car, which lurched forward. He said the defendant trotted along beside the car as it was rolling, continuing to fire shots into the car. He said he heard seven to nine shots. He said that the car stopped in Ms. King's yard and that the defendant jogged away from the car. On cross-examination, Mr. Dixson testified that the car that stopped in front of the victims' car was black, not silver. He said that after the car rolled out of sight, he brought his mother inside and that when he returned outside, a crowd was gathering at the scene of the shooting.

Special Agent Steve Scott of the Tennessee Bureau of Investigation (TBI) Crime Laboratory testified that a gun found by the police in Mr. Burgins' car was a Beretta, a semiautomatic pistol. He said nine cartridge casings were found at the scene of the shooting but that his examination revealed that they were not fired from the Beretta found in Mr. Burgins' car. He said a bullet that was removed from Ms. Robinson and two bullets that were found in the car were not fired from the gun found in Mr. Burgins' car either. Officer Patricia Resig of the Knoxville Police Department testified that the police found nine cartridge casings and that they were all found around Mr. Burgins' car.

Officer Gerald Smith of the Knoxville Police Department testified that he searched Mr. Burgins' car and found an unloaded Beretta gun underneath the front passenger seat of the car. He said he also found a small bag of marijuana and a cigar tube containing four rocks of crack cocaine

in the car. On cross-examination, Officer Smith testified that the cartridge casings were located over a length of thirty feet. He acknowledged that a car unrelated to the shooting drove through the crime scene where the cartridge casings were found. On redirect examination, Officer Smith testified that he found a bullet hole ten to twelve inches above the seat cushion of the driver's seat in Mr. Burgins' car.

Carol Wright testified that she was a 9-1-1 operator and that a call was received on June 23, 2001, at about 5:00 p.m. from an unidentified caller using a cellular telephone. The tape of the call made by the unidentified caller was played to the jury and admitted into evidence. During the call, the caller reported that a black man threw his hands up, pulled a gun out of the pocket of his shorts, and "unloaded his gun" into a car.

Dr. Sandra Elkins, a forensic pathologist, testified that she performed the autopsy on Ms. Robinson's body and that the cause of death was a gunshot wound to the chest. She said that the fatal shot went through Ms. Robinson's arm and chest, killing her and that the bullet traveled in a straight line through her chest. She said Ms. Robinson was also shot in her right forearm, her right hip, and twice in her right leg. On cross-examination, Dr. Elkins acknowledged that the straight trajectory of the gunshot wound to the chest could have occurred because the bullet ricocheted off a bone.

Officer Eric Reeves of the Knoxville Police Department testified that he had known the defendant for one to two years and that the defendant called him after the shooting, telling him that he was not involved. He said that the defendant agreed to meet with him several times on June 23, 2001, but that the defendant never went to the agreed places. He acknowledged that the defendant turned himself in to police the next day.

Officer Jerry Ashburn, the lead investigator in the defendant's case, testified that he interviewed Mr. Burgins and that Mr. Burgins told him both at the scene of the shooting and at the hospital the next day that his name was Tyrane. He said that in his interview, Mr. Burgins never said that he was afraid that the defendant or his family would harm him.

Amos Wright testified that he dated Ms. Robinson for two years but that they broke up because she caught him with another woman. He said that after they broke up, Mr. Burgins began dating Ms. Robinson but that Mr. Wright and Ms. Robinson continued to see each other secretly. He said that three to four weeks before the shooting, Mr. Burgins caught them together. He said Mr. Burgins kicked in the door and began fighting with Ms. Robinson. He said that on June 23, 2001, Mr. Burgins' cousin approached him with a message from Mr. Burgins to stay away from Ms. Robinson. He said that later that day, he was in his car with a female friend and his daughter when Mr. Burgins, his cousin, and three other men approached the car. He said that Mr. Burgins told him to get out of the car and fight. He said that he began to leave the car but that Mr. Burgins would not fight, instead lifting his shirt and showing a gun. He said he returned to his car and left. He said he called the defendant's cellular telephone and told the defendant to bring him his gun. He said the

-4-

shooting occurred ten to fifteen minutes later. He said the defendant and Mr. Burgins had not had any problems before that day.

On cross-examination, Mr. Wright testified that when Mr. Burgins' cousin told him to stay away from Ms. Robinson, he responded that Mr. Burgins did not have the right to tell him to stay away from her. He acknowledged that when he was interviewed by police after the shooting, he lied to them several times to protect the defendant. He said, however, he was truthful when he told them that Mr. Burgins had pointed a gun at him earlier in the day. He said that when Mr. Burgins showed him the gun, he was afraid for himself and his child and that he told the defendant to bring him a gun in case Mr. Burgins returned. He said he waited at his mother's house for the defendant to bring him his gun. He denied that he went to his mother's house to wait on reinforcements and denied calling Ms. Robinson a "yellow bitch." He acknowledged that he lied in his interview with the police when he told them that he was at the shooting and was ducking into buildings to avoid being shot. He said, however, that he was not lying when he told the police that the defendant called him after the shooting and told him that the reason he shot into Mr. Burgins' car was that Mr. Burgins was hanging out the window of the car with a gun. He acknowledged, though, that he did not know if the defendant was telling the truth when he told him this version of the shooting over the phone. He said that although his sister owned a black car, she was driving a maroon car on the day of the shooting.

The defendant testified that his friends nicknamed him "Thug" after a rap group when he was ten years old and that he had never been in a gang. He said that his brother, Amos Wright, had dated Ms. Robinson for about two years and that he was friends with her. He said he had known and been friends with Mr. Burgins his entire life. He said that on June 23, 2001, while he was at his sister's house, he received a call from his brother, who stated that Mr. Burgins had threatened him with a gun. He said he could hear his niece crying in the background during the phone conversation with his brother. He said his brother asked him to get a gun to help protect him. He acknowledged owning a gun and said he needed it for protection. He said that he left to go to his mother's house to meet his brother but that on the way, he saw Mr. Burgins and Ms. Robinson. He said that Mr. Burgins waived at him and that he waived back and began to walk toward Mr. Burgins' car. He said he just wanted to talk with Mr. Burgins and did not expect trouble. He said that as he approached the passenger side of Mr. Burgins car, Mr. Burgins pulled out a gun and pointed it at the defendant's chest. He said that Mr. Burgins pulled the trigger and that he heard the gun click. The defendant said he pulled out his own gun and told Mr. Burgins to drop his gun. He said that when Mr. Burgins refused, the defendant shot down into the car, toward Mr. Burgins' feet. He said he did not intend to kill Mr. Burgins and never intended to harm Ms. Robinson. He said that after the shooting, he ran away, gave his gun to a friend, and went to a motel to hide.

On cross-examination, the defendant testified that he never told the police who had his gun after the shooting. He said his brother lied on the stand to protect him when he said that he told the defendant to get Mr. Wright's gun from its hiding spot. The defendant said he used his own gun during the shooting, not Mr. Wright's gun. He acknowledged that his sister owned a black car but denied knowing whether it was the car that had parked in front of Mr. Burgins' car before the

shooting. He said that when he left his sister's house, he told her that he was going to his mother's place, but he denied telling her about his conversation with their brother. He said his brother had never called him before to tell him that someone had pointed a gun at him. He said that in his community, when two people in an argument both have guns, usually nothing happens. He said Mr. Dixson lied when he testified about the defendant's actions during the shooting. He said he did not know how many shots he fired into the car. He said he only heard Mr. Burgins' gun click one time. He said that the shot that went through Ms. Robinson's right arm and chest might have occurred when he continued shooting inside the car as he backed away from it. He said that he should have run when Mr. Burgins' gun did not fire but that he panicked. He denied using cocaine on the morning of the shooting. He acknowledged lying to Officer Reeves when he called him after the shooting, and he acknowledged staying in a motel for twenty hours before turning himself in to police. Officer Reeves, recalled by the state, testified that the defendant told him that Mr. Burgins was the shooter and had been firing at his brother, not him. He said the defendant asked if Ms. Robinson was okay.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his second degree murder conviction and his attempted second degree murder conviction because the proof shows that he acted in self-defense and, in the alternative, that he did not act "knowingly" because he was shooting at Mr. Burgins' feet. In response, the state points to the abundance of evidence refuting the defendant's claims that he acted in self-defense and that the killing was not "knowing," including the 9-1-1 tape and the testimony of Mr. Burgins, Mr. Dixson, TBI Agent Scott, Officer Relig, and Officer Smith. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A conviction for second degree murder requires proof that the defendant unlawfully and knowingly killed another. See T.C.A. §§ 39-13-201, -210(a)(1). Further, the defendant is guilty of attempted second degree murder if he knowingly attempted to kill another without adequate provocation and with the belief that his conduct would result in death without further conduct on his part. See T.C.A. § 39-12-101(a)(2). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. T.C.A. § 39-11-302(b). Tennessee's self-defense statute, T.C.A. § 39-11-611(a), provides as follows:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

The state has the burden of negating any defense raised by supporting evidence. See T.C.A. § 39-11-201(a)(3).

We believe the evidence is sufficient to warrant the jury's rejection of the defendant's self-defense claim that Mr. Burgins was trying to shoot him first and his claim that he did not act "knowingly." Although the defendant claims that the physical evidence is irreconcilable with the state's witnesses, the physical evidence only shows that an unloaded gun was found in Mr. Burgins' car when the police arrived, not that Mr. Burgins had tried to shoot the defendant with it. According to Mr. Burgins, the defendant jogged to his car, pulled out a gun, stuck the tip of the gun in his car, and began shooting. He said that he did nothing to provoke the defendant's attack and insisted that he never pointed a gun at the defendant. He said that he saw Ms. Robinson being shot and that he was shot five times.

Mr. Dixson testified that he saw the defendant jog toward Mr. Burgins' car pulling out a gun before he reached the car and that he did not see any movement from inside the car. He said that when the car rolled forward, the defendant followed it, continuing to shoot into the car. Special Agent Scott testified that none of the bullets or cartridge casings that they found came from the gun found in Mr. Burgins' car. Officer Smith testified that the cartridge casings were found over a distance of thirty feet and that if the defendant had shot inside the car while it was parked, the casings would likely be clustered closer together. Dr. Elkins testified that Ms. Robinson was shot five times, the fatal shot traveling in a straight line through her chest. Although the witnesses' testimony was not entirely consistent, viewed in the light most favorable to the state, the evidence supports the jury's finding that the defendant was upset with Mr. Burgins, that he pulled out his gun while he jogged to Mr. Burgins' car, and that he began shooting inside the car with reasonable certainty that his conduct would result in Mr. Burgins' and Ms. Robinson's deaths. The credibility and weight to be given to a witness's testimony are issues to be resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). The record reflects sufficient evidence for the jury's rejection of the defendant's self-defense claim and we believe that a rational jury could have found the defendant guilty of second degree murder beyond a reasonable doubt. Further, because the defendant would have also been guilty of a separate second degree murder conviction if he had killed Mr. Burgins, his conviction for attempted second degree murder is proper. We conclude that the evidence is sufficient to support the convictions.

## II.  PROPRIETY OF THE AMENDED INDICTMENT

The defendant contends that the trial court erred by allowing the state to amend the indictment against him to include first degree felony murder.  He claims the court erred because the amendment was unnecessary and confusing to the jury and because he was originally scheduled to go to trial before the amendment of the indictment.  The state claims it was properly allowed to amend the indictment.  We agree with the state.

The defendant's trial was originally scheduled for March 18, 2002, but was postponed until April 15, 2002, because a state witness did not appear to testify.  On March 22, 2002, the state filed a motion to amend the indictment to include a first degree felony murder charge against the defendant for the death of Ms. Robinson.  The defendant opposed the amendment because of the lateness of the state's motion and because he believed it was unnecessary.  The trial court heard arguments on the motion on April 4 and allowed the amendment over the defendant's objection on April 15.

Granting a motion to amend an indictment is a matter within the trial court's discretion, and this court will alter the trial court's decision only if that discretion has been abused.  State v. Kirkland, 696 S.W.2d 544, 545 (Tenn. Crim. App. 1985).  Rule 7(b), Tenn. R. Crim. P., states that "if no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment without the defendant's consent before jeopardy attaches."  Here, the defendant does not argue that the state charged a different offense or that he has been prejudiced by the amendment.  Moreover, he does not provide a basis for his claim that the jury was confused by the amended indictment.  The defendant has not shown that the trial court abused its discretion by allowing the state to amend the indictment.  We conclude that the defendant is not entitled to relief on this issue.

## III.  ADMISSIBILITY OF THE 9-1-1 TAPE

The defendant contends that the trial court erred by admitting into evidence a tape recording and transcript of an anonymous 9-1-1 telephone call.  He argues that the tape should not have been admitted because (1) it was not properly authenticated and (2) its benefit was substantially outweighed by the danger of unfair prejudice because the tape is unreliable and the prosecution could have used alternative methods to glean the information the tape provided.  Although the defendant does not contest the 9-1-1 tape based on hearsay grounds, the state only asserts that the 9-1-1 tape qualifies as an exception to the hearsay rule.

Tennessee Rule of Evidence 901(a) provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter is what its proponent claims."  Once this foundation is presented, the "trier of fact then makes the ultimate decision of whether the item is actually what it purports to be."  Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[2][a] (4th ed. 2000).  In the present case, Carol Wright testified as to the process by which the 9-1-1 tapes are

processed and retrieved. Ms. Wright stated that she remembered receiving a call on June 23, 2001, at about 5:00 p.m. regarding a shooting. The 9-1-1 tape was then played, and Ms. Wright said on cross-examination that she remembered the phone call. We believe that this evidence is sufficient for the trial court to determine that the jury could find that the tape was of the 9-1-1 call made by the anonymous caller describing the shooting in this case. The jury was then free to determine whether the tape was, in fact, of the 9-1-1 call involved in this case.

The defendant also claims that the 9-1-1 tape's probative value was substantially outweighed by its prejudicial effect. See Rule 403, Tenn. R. Evid. Assessing the probative value and danger of unfair prejudice regarding the evidence also falls within the trial court's discretion. State v. Burlison, 868 S.W.2d 713, 720-21 (Tenn. Crim. App. 1993). This court will only reverse a trial court's decision if the trial court abused its discretion. State v. Williamson, 919 S.W.2d 69, 78-79 (Tenn. Crim. App. 1995). In the present case, the defendant claims that the 9-1-1 tape's probative value was substantially outweighed by its prejudicial effect because the prosecution stated that the defendant was claiming that the caller on the tape was lying. The defendant, however, states in his brief that the 9-1-1 tape conformed with his testimony because he acknowledged that he "crossed the street, drew a gun and fired it into Travis Burgins' car." Because the tape conforms to the defendant's testimony, as he asserts, we do not see how it prejudiced him. As to the defendant's claim that the state used the tape to assert that he was alleging that the 9-1-1 caller was lying, he could have easily countered the prosecution's claim by stating that the 9-1-1 caller did not contradict his version of the incident. We conclude that the defendant is not entitled to relief based on this issue.

## IV. ADMISSIBILITY OF DEFENDANT'S NICKNAME, JOE THUG

The defendant contends that the trial court erred by allowing the use of the defendant's nickname, Joe Thug, because it unfairly prejudiced the jury against him. The state claims that the trial court properly allowed the use of the defendant's nickname because it was used to identify the defendant and, in the alternative, that any error in the use of the defendant's nickname was harmless. We believe that the trial court erred by allowing the prosecution to elicit the defendant's nickname multiple times from several different witnesses, but we conclude that the error was harmless.

Ms. King testified that when she approached Mr. Burgins after the shooting and asked him who had shot him, he responded, "Thug." The state claims that testimony regarding the defendant's nickname was used to establish that "Thug" was the defendant. During the prosecution's examination of Mr. Burgins, the following exchange took place:

> Q    What's [the defendant's] name as you know him?
>
> A    I know him as "Joe Thug," but I guess his name Joey.
>
> Q    Joe what?
>
> A    Joe Thug.

Q       Thug?

A       That's what I know him as, yeah.

During Officer Reeves' testimony, the following exchange occurred:

Q       Do you know [the defendant] by any nicknames?

A       Joe Thug.

Q       How long have you known Joe Thug?

A       A couple -- year or two, I guess.

During the prosecution's cross-examination of Mr. Wright, the following exchange took place regarding Mr. Wright's statement to the police about a telephone conversation he had with the defendant after the shooting:

A       Yeah. "He said, 'Man, he hung out the window on me,' and like I said, my phone went dead."

Q       Go on and finish reading that.

A       That's the end of the conversation with me and my brother.

Q       No, it's not. The next thing after that is what you said. You said, "I said 'Thug. Thug'" You remember that.

A       Yeah.

Q       That's what he goes by, isn't it, "Thug."

A       No, that ain't what he goes by.

During the defendant's testimony, he explained that he had been given the nickname "Joe Bug" when he was about ten years old because of his facial features and that shortly after that, a friend changed his nickname to "Joe Thug" in order to imitate the name of the rap group, "Bone Thugs." In its closing argument, the prosecution stated the following with regard to the defendant's nickname:

I don't want to belabor the nickname Thug, but you know, that nickname connotes all kinds of -- I don't know what meanings, whatever you want to call it. I had a nickname when I was a young

-10-

kid too, five, six years old. They called me tadpole because I was so little. Well, when I started growing, getting bigger, when I was 10, 11, 12 years old, they dropped it because I wasn't little anymore, and nobody calls me tadpole to this day. Thug seems to be a nickname that he's fairly well comfortable with. His own brother calls him Thug. He acknowledged that when he talked to him on the phone: "Thug, Thug, what happened? What happened?" Seems to be rather proud of it.

Although the defendant never specifically cites Tennessee Rule of Evidence 403, we believe that his objection to the prosecution's elicitation of his nickname is, in fact, a claim based on Rule 403. The rule states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In State v. Zirkle, 910 S.W.2d 874, 886 (Tenn. Crim. App. 1995), this court stated, "Nicknames should generally be avoided[]" during a trial and that "trial courts should closely monitor any misuse." In the present case, the state's second witness, Mr. Burgins, testified that the defendant was known as Joe Thug. In its cross-examination of Mr. Burgins, defense counsel never attempted to dispute that the defendant was Joe Thug and, in fact, the transcript reflects that defense counsel's questioning of Mr. Burgins was designed to establish that the defendant either acted in self-defense or did not intend to kill Ms. Robinson or Mr. Burgins. After Mr. Burgins' testimony, however, the prosecution elicited the defendant's nickname from three additional witnesses under the guise of proving his identity as the shooter. Moreover, during three of the witness examinations by the prosecution, the name "Thug" or "Joe Thug" was used multiple times. In addition, the prosecution's closing argument, in which the prosecutor stated that the defendant was proud of his nickname, belies the state's claim that the nickname was used solely for the purpose of identification.

We believe, however, that the prosecution's multiple use of the defendant's nickname during its examination of several witnesses, although improper, was harmless error as the defendant has not shown that the error affirmatively affected the result of the trial. See Tenn. R. Crim. P. 52(a). The defendant's testimony showed that he received the nickname based on a rap group when he was ten years old, indicating that his nickname was not the product of criminal behavior. See State v. James Whitelow and Robert Robertson, No. W2001-00713-CCA-R3-CD, Lauderdale County (Tenn. Crim. App. May 6, 2002) (stating that the defendant's clarification that he had been given the name as a child was important in determining that the prosecution's improper use of the defendant's nickname was harmless error). Also, in our examination of the record, we do not believe that the prosecution saturated the jury with the defendant's nickname to the extent that the record affirmatively shows that it affected the jury's verdict. We conclude that the trial court's error was harmless.

## V. PRIOR BAD ACTS

The defendant contends that the trial court erred by allowing the prosecution to cross-examine him about whether he committed a robbery in April 2000. The state claims that the trial court properly allowed the prosecution to inquire about the robbery.

Before trial, the defendant filed a motion requesting that the trial court preclude the prosecution from inquiring into the defendant's arrest for a robbery in April 2000 because the charge had been dismissed. The defendant argued that his arrest for robbery was not probative of untruthfulness under Rule 608, Tenn. R. Evid. Shortly before the defendant took the stand, the trial court, with no explanation, denied the defendant's motion. During the prosecution's cross-examination of the defendant at trial, the following exchange took place:

> Q      By the way, you're the same Joey DeWayne Thompson, are you not, that committed the offense of robbery on the corner of Pascal and Minnesota here in Knox County on April 14th in the year 2000, eleven o'clock at night?
>
> A      No, sir.
>
> Q      You didn't do that?
>
> A      No, sir, I did not.

Pursuant to Rule 608(b), Tenn. R. Evid, specific instances of conduct may be used to impeach a witness during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. Before a witness can be questioned about the specific instance of conduct, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). In addition, when the witness is the defendant, the trial court must determine whether, "the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 608(b)(3).

Initially, we note that the defendant cites no authority in support of his argument that the trial court erred by allowing the prosecution to ask the defendant about the robbery, a circumstance which results in the issue being treated as waived. Tenn. Ct. Crim. App. R. 10(b); State v. Galloway, 696 S.W.2d 364, 368 (Tenn. Crim. App. 1985). In any event, we believe the trial court was within its discretion in allowing the prosecution to question the defendant about the robbery. The defendant testified at trial that he shot at Mr. Burgins in self-defense and was not trying to kill anyone. The prosecution questioned him about the robbery in an attempt to impeach his testimony. In State v. Caruthers, 676 S.W.2d 935, 941 (Tenn. 1984), our supreme court stated that a robbery involved dishonesty. Thus, it was properly used to impeach the testimony of a witness pursuant to Rule 608(b), Tenn. R. Evid. The defendant claims that questioning him about the robbery was improper

because the charge was dismissed. Dismissal of criminal charges, however, does not preclude the use of this prior misconduct as a means to impeach. See State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). The defendant provides no other basis for a conclusion that the trial court erred by allowing the prosecutor to question him on the robbery. We conclude that the questioning was proper.

## VI. PROSECUTORIAL MISCONDUCT

The defendant contends that his conviction should be reversed because the prosecution improperly influenced the jury: (1) by using the defendant's nickname, "Joe Thug"; (2) by asking the defendant if he had committed a robbery in April 2000; (3) by asking if the defendant if he had been upset with his girlfriend on the morning of the shooting; (4) by asking if the defendant had used cocaine on the morning of the shooting; and (5) by commenting on the defendant's sister's absence during closing arguments. The state asserts that the defendant has waived the issues of the prosecution's questions about cocaine and his girlfriend, that the prosecution properly commented on the defendant's sister's absence at trial under the missing witness rule, and that any mistaken conduct that occurred was minor and does not warrant relief. We believe that the defendant is not entitled to relief based on this issue.

When claiming prosecutorial misconduct in argument, the defendant is required to show that the argument was so inflammatory or the conduct so improper that it affected the verdict to his detriment. Harrington v. State, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965). In review, this court should consider several factors, including the intent of the prosecutor, the curative measures which were undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any other errors in the record, and the relative strength or weakness of the case. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). The trial court has wide discretion in controlling the argument of counsel. State v. Smith, 527 S.W.2d 737, 739 (Tenn. 1975).

With regard to use of the defendant's nickname, we have already determined that the trial court erred but that the error was harmless. In addition, with regard to the prosecution's questioning the defendant about the April 2000 robbery, we have determined that the trial court ruled within its discretion. As to questioning the defendant about his girlfriend and his cocaine use, the statements of concern to the defendant are as follows:

> Q    Did you have a girlfriend at the time?
>
> A    Yes, sir, I did.
>
> Q    You were going to have some trouble with her, weren't you?
>
> A    No, sir, I wasn't.

Q       You were mad at your girlfriend that morning, weren't you?

A       No, sir, I wasn't.

Q       You had a fight with her?

A       No, sir.

Q       You had been using cocaine that day, hadn't you?

A       No, sir, I -- I don't do drugs, sir.

Q       You were snorting cocaine about that time, weren't you?

A       No, sir, never have.

The state asserts that the defendant did not object to these arguments at trial. Needless to say, neither the trial court nor the state was made aware of any need to stop the argument, alter the argument, or give curative instructions. The defendant claims that he did not object because he was given a Hobson's choice: either continually object and risk the jury thinking that he was trying to hide something or remain silent during the improper questioning. The record reflects, however, that the above exchange was the only time the prosecution asked about the defendant's girlfriend or his cocaine use. Two objections would have sufficed. Under these circumstances, the defendant has waived these issues.

With regard to the defendant's sister, Lisa Wright, the prosecution argued as follows:

> Let me tell you about another reluctant relative, Lisa Wright, Amos Wright's sister and this defendant's sister. She was right in the middle of this.
>
> . . . .
>
> And she was there at her house when this call came in. If anybody would know about [the defendant's] state of mind when he got that first phone call telling him that a gun's been pulled on his brother, she would. She's a reluctant relative. And they don't even know where she is. That's the best-case scenario. Worst case is they told her not to come. Talk about a reluctant relative, if she had something good to say for her brother or brothers, she'd be here.

The state asserts that the prosecution properly commented on Ms. Wright's absence because of the missing witness rule. Under the missing witness rule, a party is entitled to argue that if it is

peculiarly within one party's power to produce a witness whose testimony would naturally be favorable to that party, the failure to call that witness creates an adverse inference that the testimony would have been unfavorable. State v. Francis, 669 S.W.2d 85, 88 (Tenn. 1984) (quoting Graves v. United States, 150 U.S. 118, 121, 14 S. Ct. 40, 41 (1893)). Generally, three conditions must be met before the inference is allowed: (1) the witness had knowledge of material facts, (2) the relationship between the witness and the party would naturally incline the witness to favor the party, and (3) the witness was available to the process of the court for the trial. See Delk v. State, 590 S.W.2d 435, 440 (Tenn. 1979). In the present case, the evidence reflects that Ms. Wright was with the defendant when he received the phone call from Amos Wright about the confrontation with Mr. Burgins and could have testified about his reaction. Also, as the defendant's sister, her testimony would be expected to favor the defendant. The defendant testified that his sister was in Chicago, and we believe that she would have been particularly available to the defendant if he had wanted her to testify. The criteria for applying the missing witness rule being met, we conclude that the prosecution properly commented on Ms. Wright's absence during its closing argument.

## VII. JURY INSTRUCTIONS

The defendant contends that the trial court committed plain error in its "knowing" instructions to the jury on second degree murder and attempted second degree murder. The state concedes that the trial court erred in its instructions but claims that the error was harmless.

The trial court's jury charge with regard to second degree murder stated:

> Any person who commits second-degree murder is guilty of a crime. For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant . . . unlawfully killed the alleged victim; and
>
> (2) that the defendant acted knowingly
>
> A person acts knowingly if that person acts with an awareness either (1) that his or her conduct is of a particular nature, or that a particular circumstance exists.
>
> The requirement of knowingly is also established if it is shown that the defendant acted intentionally.

With regard to attempted second degree murder, the trial court instructed the jury that the state must have proven "(1) that the defendant attempted to unlawfully kill the alleged victim[]" and "(2) that the defendant acted knowingly." The trial court stated that the term "knowing" had previously been

defined in its instructions. The trial court completely omitted the result-of-conduct element of "knowing."

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30. The trial court must describe each element of an offense and define the element in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). A charge is prejudicial error if it fails to "submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).

Initially, we note that the record reflects that the defendant did not request instruction on a different definition of knowing at the trial. See Tenn. R. Crim. P. 30(a) (providing that the parties may file written requests that the trial court give certain instructions). The defendant also did not raise the issue in his motion for a new trial, which would preclude our review of this issue, subject to our noticing plain error. Tenn. R. Crim. P. 52(b); see also T.R.A.P. 3(e) (providing that issues regarding grant or refusal of jury instructions that are not raised in a motion for new trial will be treated as waived on appeal), 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error).

Pursuant to Rule 52(b), Tenn. R. Crim. P., we have the discretion to notice an error that has affected the substantial rights of an accused when necessary to do substantial justice. The following factors should be considered in determining the existence of plain error:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). As noted in Adkisson, "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." 899 S.W.2d at 642. The failure to give a constitutionally required jury instruction may constitute plain error when the failure cannot be classified as harmless beyond a reasonable doubt. State v. Page, 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002).

In determining whether the trial court erred in its instructions to the jury, the term "knowing" is defined as follows:

> a person . . . acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person

acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

T.C.A. § 39-11-106(20). Second degree murder is a "result-of-conduct offense" which "requires that the culpable mental state accompany the result as opposed to the nature of the conduct." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, the prosecution must prove beyond a reasonable doubt that the defendant was "aware that the conduct [was] reasonably certain to cause the result." T.C.A. § 39-11-302. Proving that the defendant was simply aware of the nature of his conduct or that the circumstances surrounding his conduct existed will not suffice to show that the defendant acted "knowingly." In the present case, the trial court did, in fact, instruct the jury that if it found that the defendant was aware that his conduct was of a particular nature or that particular circumstances existed, then he acted "knowingly." This instruction is improper because it placed a lesser burden on the prosecution than required for this result-of-conduct offense.

Finally, we must determine whether the trial court's erroneous jury instruction was harmless error. In State v. Keith T. Dupree, No. W1999-01019-CCA-R3-CD, Shelby County, slip op. at 6 (Tenn. Crim. App. Jan. 30, 2001), this court concluded that the trial court's omission of the result-of-conduct element of "knowing" was not harmless error when the issue at trial was whether the shooting was knowing or accidental. In the present case, the defendant acknowledged shooting the victims, but the defense argued that he fired toward the floor of the car and never intended to kill Mr. Burgins or Ms. Robinson. This claim would support the theory that he was not aware that his conduct was reasonably certain to result in deaths. Under the instruction given by the trial court, however, a jury might have determined that he was guilty of second degree murder solely because of the circumstances surrounding the shooting. Although the defendant claimed, in part, that he was acting in self-defense, the record reflects that his defense counsel continually emphasized that he shot the gun toward the floor of the car, never intending to kill either of the victims. The defendant's mental state was at issue throughout his trial and the jury instruction improperly allowed the jury to convict the defendant of second degree murder without finding that he knew that his actions were reasonably certain to result in the victims' deaths. Because the defendant consistently contested his awareness of the reasonably certain result of his conduct, we conclude that it does not appear beyond a reasonable doubt that the trial court's failure to instruct the jury properly did not affect the outcome of the trial.

Also, because the defendant's mental state was contested at trial, we also believe the instruction on attempted second degree murder was harmful to the defendant. See T.C.A. § 39-12-101(a)(2). We conclude that the trial court committed harmful error in its "knowing" instructions to the jury and that the defendant's convictions for second degree murder and attempted second degree murder should be reversed.

## VIII. SENTENCING

The defendant contends that the trial court erred by imposing an excessive sentence and by ordering that he serve his sentences consecutively. The state contends that the defendant's sentences are proper. We agree with the state.

At the sentencing hearing, the trial court found the following enhancement factors applicable to the defendant's second degree murder conviction and his attempted second degree murder conviction, as listed in T.C.A. § 40-35-114:

> (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (9) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
>
> (10) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;
>
> (11) The defendant had no hesitation about committing a crime when the risk to human life was high;
>
> (13) During the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim;
>
> (17) The crime was committed under circumstances under which the potential for bodily injury to a victim was great;
>
> (21) The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult . . . .

In addition for the defendant's attempted second degree murder conviction only, the trial court found enhancement factor (6) applicable, that "[t]he defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense . . . ." T.C.A. § 40-35-114(6). The trial court also determined that no mitigating factors applied. It sentenced the defendant to twenty-five years in the Department of Correction for his second degree murder conviction, to be served consecutively to his twelve-year sentence for attempted second degree murder. The trial court found that the defendant's extensive criminal history and the fact that he is a dangerous offender justified his serving the twenty-five-year sentence consecutively to the twelve-year sentence. See T.C.A. § 40-35-115(b)(2), (4).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

The sentence to be imposed by the trial court is presumptively the midpoint in the range for a Class A felony and the minimum in the range for a Class B felony unless there are enhancement factors present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

Initially, we again note that the defendant has hampered our de novo review in this case by failing to include the presentence report in the record on appeal. It is incumbent upon the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired relative

to the issues on appeal. T.R.A.P. 24(b). In the absence of an appropriate record, we must presume that the trial court's determinations are correct. See, e.g., State v. Meeks, 779 S.W.2d 394, 397 (Tenn. Crim. App. 1988); State v. Beech, 744 S.W.2d 585, 588 (Tenn. Crim. App. 1987).

The defendant argues and the state concedes that the trial court erred by applying enhancement factors (11), (13), and (17). We agree with the parties that the trial court erred by enhancing the defendant's sentence based upon factor (17). The trial court erred by applying factor (17), that the crime was committed when the potential for bodily injury to the victim was great, because this factor is inherent in second degree murder and attempted second degree murder. See State v. Lambert, 741 S.W.2d 127, 134 (Tenn. Crim. App. 1987). With regard to factor (11), however, that "[t]he defendant had no hesitation about committing the crime when the risk to human life was high," we believe the trial court properly applied this factor to the defendant's convictions. Although the risk to life might be inherent in the defendant's conduct, his conduct put a second person at risk during each crime. See State v. Jones, 883 S.W.2d 597, 603 (Tenn. 1994) (holding that factor (11) applies when others are put at high risk).

The defendant also contends and the state agrees that enhancement factor (13), which states that "[d]uring the commission of the felony, the defendant willfully inflicted bodily injury upon another person, or the actions of the defendant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim," was incorrectly applied by the trial court. Both victims were seriously injured in this case and thus, this factor applies unless "serious bodily injury" is inherent in second degree murder or attempted second degree murder. As serious bodily injury is obviously necessary for second degree murder, the question turns to whether serious bodily injury is also inherent in attempted murder. In State v. Makoka, 885 S.W.2d 366, 374 (Tenn. Crim. App. 1994), this court held that factor (13) may not be used to enhance a defendant's sentence for attempted murder because the potential for serious bodily injury is encompassed within the offense. However, in State v. Freeman, 943 S.W.2d 25, 32 (Tenn. Crim. App. 1996), this court observed that in State v. Trusty, 919 S.W.2d 305, 308 (Tenn. 1996), our supreme court stated that an attempted murder does not require bodily injury and, therefore, the court in Freeman concluded that the holding in Makoka concerning the applicability of factor (13) was of "questionable validity." Subsequent to the conclusion in Freeman, this court has again stated that enhancement factor (13) may be applied to attempted murder sentences. See State v. Marquez Winters, No. W2002-00740-CCA-R3-CD, Shelby County ( Tenn. Crim. App. Oct. 15, 2002); State v. Frank E. Huey, No.M2000-02793-CCA-R3-CD, Davidson County (Tenn Crim. App. Oct. 13, 2002); State v. Jimmy A. Salyer, No. 03C01-9803-CR-00093, Sullivan County (Tenn. Crim. App. Oct. 8, 1999); State v. Derrick McClure, No. 02C01-9705-CR-00192, Shelby County (Tenn. Crim. App. March 31, 1998). We conclude that enhancement factor (13) was properly applied by the trial court.

With regard to enhancement factor (6), that the defendant was exceptionally cruel to the victim, the defendant contends that the trial court incorrectly applied this factor to the defendant's attempted second degree murder conviction. See T.C.A. § 40-35-114(6). The defendant shot into Mr. Burgins' car at least ten times and Mr. Burgins was hit multiple times. In the context of a defendant attempting to kill another person, we are not in a position to conclude that the evidence

preponderates against the trial court's findings. Accordingly, we believe the trial court did not err in applying factor (6). Because the defendant used a firearm in the commission of the offense, the trial court correctly applied factor (10).

With regard to factor (2), that the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range"; factor (9), that "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community"; and factor (21), that "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult," we must presume that the trial court's application was proper because of the absence of the defendant's presentence report. See T.C.A. § 40-35-114(2), (9), (21). Presuming the propriety of the trial court's application of and weight given to these factors, we must conclude that the length of the defendant's sentences is proper.

The defendant also contends that the trial court erred by ordering him to serve his twenty-five-year sentence for second degree murder consecutively to his twelve-year sentence for attempted second degree murder. In ordering the consecutive sentences, the trial court stated that the defendant was a dangerous offender and had an extensive criminal history. See T.C.A. 40-35-115(b)(2),(4). The defendant argues that his juvenile record does not qualify as an extensive criminal history and that his dangerous offender status is not sufficient for consecutive sentencing. Although the defendant refers to an "Attachment of Juvenile record from sentencing hearing 9/12/02" to argue that his juvenile record does not rise to the level of an extensive criminal history, no such document has been included in the record on appeal. See T.R.A.P. 24(b). Without the presentence report or other documentation of the defendant's criminal history, including his criminal behavior as a juvenile, we have no way of reviewing the trial court's findings and must presume that its findings were correct. Under these circumstances, we must conclude that the trial court's findings regarding consecutive sentencing are correct.

Finally, given the fact that we are remanding the case for a new trial, we see no need to consider the potential application of Blakely v. Washington, 542 U.S. _____ (2004) to the case. For this case, such is left for another day.

In consideration of the foregoing and the record as a whole, the trial court is reversed and the case is remanded for a new trial.

_____
JOSEPH M. TIPTON, JUDGE

-21-